**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,

                                    **Jury Trial Demand**

        Plaintiffs,

    -v-

CENTRO DE REHABILITACION NUEVA VIDA
CORP, HEALING MINDS MENTAL HEALTH
CORP, YELENIS CORDERO GUERRA, JORGE
A. CORREA, BARBARITA GARCIA, B&A
PHYSICAL CARE CORP, ALAIN TOLEDO
ROA, ARTURO RODRIGUEZ, and SARAH
HUGHES, D.O.,

        Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs") hereby

allege as follows:

1.     This action seeks to recover more than $1,800,000.00 that the Defendants

wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault

("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Centro

de Rehabilitacion Nueva Vida Corp ("Centro de Rehab"), Healing Minds Mental Health Corp

("Healing Minds"), and B&A Physical Care Corp ("B&A Physical")(collectively, the "Hughes

Clinics"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable

health care services, including putative initial examinations, follow-up examinations, percutaneous electrical nerve stimulation ("PENS") treatments, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.  In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful no-fault PIP claims that the Defendants have submitted through the Hughes Clinics because:

(i)  at all relevant times, Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), and Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act");

(ii)  the underlying Fraudulent Services were not medically necessary, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received the Fraudulent Services;

(iii)  in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)  the Defendants' billing for the Fraudulent Services misrepresented the nature, extent, results, and medical necessity of the Fraudulent Services, in order to fraudulently inflate the charges submitted to GEICO;

(v)  the Defendants unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed/unsupervised individuals; and

(vi)  the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3.  As set forth below, the Defendants – at all relevant times – have known that:

(i)  the Defendants operated in violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and were, therefore, ineligible for PIP reimbursement;

2

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were performed – to the extent that they were performed at all – by massage therapists, and were, therefore, ineligible for PIP reimbursement;

(iv)    in many cases, the Fraudulent Services were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services, and were, therefore, ineligible for PIP reimbursement;

(v)     in many cases, the billing submitted through the Hughes Clinics misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the No-Fault Law, rendering the charges ineligible for PIP reimbursement;

(vi)    in many cases, the Fraudulent Services were never provided in the first instance; and

(vii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to fraudulently inflate the charges submitted to GEICO.

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Hughes Clinics.

5.      The charts attached as Exhibits "1" - "3" set forth large, representative examples of the fraudulent claims that have been identified to date that the Defendants have submitted through the respective Hughes Clinics to GEICO.

6.      The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' fraudulent schemes, GEICO has incurred damages of more than $1,800,000.00.

**I.      Plaintiffs**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO

3

General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.     Defendants

8.     Defendant Centro de Rehab is a Florida corporation with its principal place of business in Hialeah, Florida. Centro de Rehab was incorporated in Florida on or about March 20, 2017, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9.     At all relevant times, Centro de Rehab falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

10.     Centro de Rehab falsely purported to have Defendant Sarah Hughes, D.O. ("Hughes") as its medical director from May 2019 to the present.

11.     Defendant Healing Minds is a Florida corporation with its principal place of business in Miami, Florida. Healing Minds was incorporated in Florida on or about January 7, 2021, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     At all relevant times, Healing Minds falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

13.     Healing Minds falsely purported to have Defendant Hughes as its medical director from July 2022 to the present.

14.     Defendant Barbarita Garcia ("Garcia") resides in and is a citizen of Florida. Garcia

4

owned and controlled Centro de Rehab between September 2020 and the present, and owned and controlled Healing Minds between July 2022 and the present, and used Centro de Rehab and Healing Minds as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

15. Defendant Yelenis Cordero Guerra ("Guerra") resides in and is a citizen of Florida. Guerra owned and controlled Healing Minds between October 2021 and September 2022, and used Healing Minds as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

16. Defendant Jorge A. Correa ("Correa") resides in and is a citizen of Florida. Correa owned and controlled Healing Minds between October 2021 and August 2022, and used Healing Minds as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17. Defendant B&A Physical is a Florida corporation with its principal place of business in Miami Beach, Florida. B&A Physical was incorporated in Florida on or about September 13, 2023, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

18. At all relevant times, B&A Physical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

19. B&A Physical falsely purported to have Defendant Hughes as its medical director from November 2023 to late 2025.

20. Defendants Alain Toledo Roa ("Roa") and Arturo Rodriguez ("Rodriguez") reside in and are citizens of Florida. Roa owned and controlled B&A Physical between December 2024

and the present, and Rodriguez owned and controlled B&A Physical between September 2023 and December 2024, and both Roa and Rodriguez used B&A Physical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

21. Upon information and belief based on publicly-available information, Defendant Hughes resides in and is a citizen of Montana. Hughes was licensed to practice medicine in Florida on or about February 21, 2019, and falsely purported to serve as medical director at each of the Hughes Clinics.

### III. Other Relevant Individuals

22. Although GEICO does not currently name them as Defendants in this Complaint, Damisela Amador, A.P.R.N. ("Amador"), Jose Gomez-Cortes, M.D. ("Gomez-Cortes"), Raja Moti Gidwani, M.D. ("Gidwani"), and Sander Fernandez, M.D. ("Fernandez") are also relevant to understanding Plaintiffs' claims in this action.

23. Amador is a licensed in Florida as an advanced practice registered nurse, was employed by or associated with the Hughes Clinics, and purported to perform Fraudulent Services on behalf of the Hughes Clinics.

24. Gomez-Cortes is licensed to practice medicine in Florida, was employed by or associated with the Hughes Clinics, and purported to perform Fraudulent Services on behalf of the Hughes Clinics.

25. Gomez-Cortes has a history of involvement in fraudulent PIP billing schemes. For example, in an action entitled Government Employees Insurance Co., et al. v. Gomez-Cortes, et al., S.D. Fla. Case No. 1:20-cv-21558-KMW, GEICO obtained a judgment against Gomez-Cortes for more than $7,750,000.00 – on fraud, unjust enrichment, and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims – based on Gomez-Cortes's activities at several Florida

health care clinics where Gomez-Cortes purported to be the "medical director" and a main treating practitioner.

26. What is more, in an action entitled State Farm Mutual Automobile Insurance Company, et al. v. Health and Wellness Services, Inc., et al., S.D. Fla. Case No. 1:18-cv-23125-RNS, State Farm obtained a judgment against Gomez-Cortes for more than $80,000.00 – on unjust enrichment and FDUTPA claims – based on Gomez-Cortes's activities at a Florida health care clinic where Gomez-Cortes purported to be the "medical director" and a main treating practitioner.

27. Upon information and belief, Gomez-Cortes's history of involvement in fraudulent PIP billing schemes – which can be identified by potential employers, patients, and referral sources via internet searches – has made it virtually impossible for him to obtain medical employment in legitimate settings, and made him amenable to participation in the fraudulent and unlawful schemes described herein.

28. Gidwani and Fernandez are both licensed to practice medicine in Florida.

29. Prior to Hughes, Healing Minds falsely purported to have Gidwani as its medical director from February 2021 to October 2021, and Fernandez as its medical director from October 2021 to July 2022.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

31. The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

32.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS**

**I.      Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

34.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to Insureds.

35.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

36.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

37.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

38.     Thus, health care services providers, including clinics licensed under the Clinic Act,

8

may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

39.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

40.     Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

41.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

42.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

43.     Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

44.     In addition, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect

the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

45.     Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

46.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

47.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

48.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

49.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

50.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

10

51.	Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(i)	in accordance with generally accepted standards of medical practice;

(ii)	clinically appropriate in terms of type, frequency, extent, site, and duration; and

(iii)	not primarily for the convenience of the patient, physician, or other health care provider.

52.	PIP reimbursement for health care services is limited to $2,500.00 per injured person, unless a physician, physician assistant, or advanced practice registered nurse determines that the injured person suffered from an "emergency medical condition", in which case health care providers can be reimbursed up to $10,000.00 per Insured for health care services. See Fla. Stat. § 627.736.

53.	Pursuant to the No-Fault Law, an "emergency medical condition" means a "medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) serious jeopardy to patient health. (b) serious impairment to bodily functions. (c) serious dysfunction of any bodily organ or part." Fla. Stat. § 627.732.

54.	Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

55.	However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

56.	Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they

11

have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

57.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

58.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

59.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

60.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

61.     To "directly supervise" a service, a supervising health care practitioner "must be

present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

62.     Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Interrelated Fraudulent and Unlawful Schemes

63.     Beginning in at least 2020, and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A.     The Defendants' Violations of the Clinic Act

64.     Because Centro de Rehab, Healing Minds, and B&A Physical are health care clinics subject to the Clinic Act: (i) Garcia could not operate Centro de Rehab; (ii) Guerra, Correa, and Garcia could not operate Healing Minds; and (iii) Roa and Rodriguez could not operate B&A Physical, unless they obtained clinic licenses for their respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

65.     However, if the Hughes Clinics retained legitimate physicians to serve as their medical directors, any such physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent schemes.

66.     Accordingly:

(i)      Garcia recruited Hughes, a licensed physician, who was willing to falsely pose as the legitimate medical director at Centro de Rehab, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii)     Guerra, Correa, and Garcia recruited Fernandez, then Gidwani, and then Hughes, who were licensed physicians willing to falsely pose as the legitimate medical directors at Healing Minds, but who – in actuality – would not fulfill the statutory requirements applicable to clinic medical directors at the clinic; and

(iii)    Roa and Rodriguez recruited Hughes, a licensed physician, who was willing to falsely pose as the legitimate medical director at B&A Physical, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic.

67.      Hughes was never a genuine medical director for Centro de Rehab, Healing Minds, and B&A Physical, nor were Fernandez or Gidwani genuine medical directors for Healing Minds prior to Hughes.

68.      Instead, throughout Hughes' association with each of the Hughes Clinics, and throughout Fernandez and Gidwani's association with Healing Minds, they ceded all day-to-day decision-making and oversight regarding health care services at the respective Hughes Clinics, and the resulting billing, to the respective Hughes Clinics' owners.

69.      In keeping with the fact that Hughes was never a genuine medical director at any of the Hughes Clinics, and in keeping with the fact that Fernandez and Gidwani were never genuine medical directors at Healing Minds, they never legitimately conducted systematic reviews of the respective clinics' billings to ensure that the billings were not fraudulent or unlawful, and instead permitted the clinics to operate in the fraudulent and unlawful manner described herein.

70.      What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Hughes never provided legitimate, day-to-day supervision at any of the Hughes Clinics, Fernandez and Gidwani never provided legitimate day-to-day supervision at Healing Minds, and – in fact – they only occasionally were present at the

14

respective clinics during their purported tenures as "medical directors", if at all.

71.     For example, Centro de Rehab's May 2019 health care clinic license application – which was submitted under penalty of perjury – represented that Hughes, Centro de Rehab's purported medical director, was only present at Centro de Rehab for two hours per week.

72.     Likewise, Healing Minds' April 2023 clinic license application – which also was submitted under penalty of perjury – represented that Hughes, Healing Minds' purported medical director at the time, was only present at Healing Minds one day per month.

73.     Similarly, B&A Physical's November 2023 clinic license application – again, submitted under penalty of perjury – represented that Hughes, B&A Physical's purported medical director at the time, was only present at B&A Physical one day per month.

74.     In the claims identified in Exhibits "1" - "3", the Defendants falsely represented that the Hughes Clinics were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

75.     In fact, the Hughes Clinics were never in compliance with the Clinic Act, and thus were never eligible to receive PIP reimbursement.

**B.      The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at the Hughes Clinics, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners at the Hughes Clinics**

76.     The Hughes Clinics billed for a range of health care services, specifically: (i) purported patient examinations; (ii) purported PENS treatments; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction therapy, ultrasound therapy, therapeutic exercises, manual therapy, and electrical stimulation.

77.     In the claims identified in Exhibits "1" - "3", the purported physical therapy services constituted the majority of the services that were billed through the respective Hughes

Clinics to GEICO.

78.     In the claims identified in Exhibits "1" - "3", the purported physical therapy services were unlawfully performed – to the extent they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including Berta Zornoza Lopez, L.M.T. ("Lopez"), Denia Pellitero, L.M.T. ("Pellitero"), Juan Carlos Chavez, L.M.T. ("Chavez"), Olga L. Caballero Hernandez, L.M.T. ("Hernandez"), Saidee Diaz, L.M.T. ("Diaz"), Dimey Garcia, L.M.T. ("D. Garcia"), and Juan Carlos Ross, L.M.T. ("Ross").

79.     In particular, Lopez, Pellitero, Chavez, Hernandez, and Diaz were employed by or associated with Centro de Rehab, and purported to perform many of the Fraudulent Services on behalf of Centro de Rehab.

80.     D. Garcia was employed by or associated with Healing Minds, and purported to perform many of the Fraudulent Services on behalf of Healing Minds.

81.     Ross was employed by or associated with B&A Physical, and purported to perform many of the Fraudulent Services on behalf of B&A Physical.

82.     The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists or unsupervised/unlicensed individuals.

83.     As a result, and in order to conceal the fact that Lopez, Pellitero, Chavez, Hernandez, Dia, D. Garcia, Ross, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through the Hughes Clinics to GEICO, the Defendants deliberately omitted any reference to Lopez, Pellitero, Chavez, Hernandez, Dia, D. Garcia, Ross, and the other massage therapists and unlicensed individuals associated with the Hughes Clinics on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

84. Instead, in the claims for physical therapy services identified in Exhibits "1" - "3", each of the Hughes Clinics routinely and falsely listed Amador and Gomes-Cortez in Box 31 of the HCFA-1500 forms as the supposed providers or direct supervisors of the physical therapy services.

85. In fact, Amador and Gomes-Cortez – who were simultaneously purporting to perform large amounts of health care services at numerous health care practices at numerous locations – did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibits "1" - "3", and could not have legitimately performed or directly supervised the physical therapy services.

86. For example:

(i) On October 20, 2020, Gomez-Cortes purported to personally perform – or at least directly supervise – at least 31.25 hours of physical therapy and related services that were provided to at least 17 different GEICO Insureds at Centro de Rehab and three additional locations.

(ii) On December 22, 2020, Gomez-Cortes purported to personally perform – or at least directly supervise – at least 35.25 hours of physical therapy and related services that were provided to at least 20 different GEICO Insureds at Centro de Rehab and three additional locations.

(iii) On January 19, 2021, Gomez-Cortes purported to personally perform – or at least directly supervise – at least 26.25 hours of physical therapy and related services that were provided to at least 13 different GEICO Insureds at Centro de Rehab and three additional locations.

(iv) On May 26, 2021, Gomez-Cortes purported to personally perform – or at least directly supervise – at least 23 hours of physical therapy and related services that were provided to at least 11 different GEICO Insureds at Centro de Rehab and three additional locations.

(v) On June 16, 2021, Gomez-Cortes purported to personally perform – or at least directly supervise – at least 22.5 hours of physical therapy and related services that were provided to at least 11 different GEICO Insureds at Centro de Rehab and six additional locations.

(vi) On November 22, 2021, Amador purported to personally perform – or at least

17

directly supervise – at least 40.75 hours of physical therapy and related services that were provided to at least 16 different GEICO Insureds at Centro de Rehab and seven additional locations.

(vii)   On February 7, 2022, Amador purported to personally perform – or at least directly supervise – at least 40.75 hours of physical therapy and related services that were provided to at least 15 different GEICO Insureds at Centro de Rehab and two additional locations.

(viii)  On August 4, 2022, Amador purported to personally perform – or at least directly supervise – at least 39 hours of physical therapy and related services that were provided to at least 16 different GEICO Insureds at Centro de Rehab, Healing Minds, and two additional locations.

(ix)    On March 16, 2023, Amador purported to personally perform – or at least directly supervise – at least 34.75 hours of physical therapy and related services that were provided to at least 15 different GEICO Insureds at Centro de Rehab, Healing Minds, and three additional locations.

(x)     On September 1, 2023, Amador purported to personally perform – or at least directly supervise – at least 34.25 hours of physical therapy and related services that were provided to at least 11 different GEICO Insureds at Centro de Rehab, Healing Minds, and one additional location.

(xi)    On June 27, 2024, Amador purported to personally perform – or at least directly supervise – at least 21 hours of physical therapy and related services that were provided to at least nine different GEICO Insureds at Centro de Rehab, Healing Minds, B&A Physical, and two additional locations.

(xii)   On July 12, 2024, Amador purported to personally perform – or at least directly supervise – at least 27 hours of physical therapy and related services that were provided to at least 11 different GEICO Insureds at Centro de Rehab, Healing Minds, B&A Physical, and two additional locations.

(xiii)  On August 28, 2024, Amador purported to personally perform – or at least directly supervise – at least 21 hours of physical therapy and related services that were provided to at least nine different GEICO Insureds at Centro de Rehab, Healing Minds, B&A Physical, and one additional location.

(xiv)   On September 4, 2024, Amador purported to personally perform – or at least directly supervise – at least 26 hours of physical therapy and related services that were provided to at least 10 different GEICO Insureds at Healing Minds and two additional locations.

(xv)    On January 22, 2025, Amador purported to personally perform – or at least directly supervise – at least 22 hours of physical therapy and related services that were

provided to at least eight different GEICO Insureds at Centro de Rehab, Healing Minds, and two additional locations.

87.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" - "3", the Defendants routinely falsely represented that Amador and Gomes-Cortez had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services they simultaneously were purporting to perform or directly supervise at other health care clinics at multiple locations on those same dates.

88.     It is impossible that Amador and Gomes-Cortez routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

89.     Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

90.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

91.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers.

92.     Thus, upon information and belief, the impossible number of physical therapy services that Amador and Gomes-Cortez purported to directly supervise or provide to GEICO Insureds at the Hughes Clinics – and other clinics on individual dates of service, including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Amador and Gomes-Cortez purported to perform or directly

19

supervise on those same dates of service.

93.     In the claims for physical therapy services identified in Exhibits "1" - "3", the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    the Hughes Clinics could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unsupervised/unlicensed individuals, and because the clinics operated in violation of Florida law; and

(iii)   the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

**C.     The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Deductibles from Their Patients**

94.     The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Hughes Clinics for medically unnecessary treatment.

95.     Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

96.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-

1500 forms) submitted to GEICO through the Hughes Clinics for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

97.     In the claims identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

98.     In this context, Hughes, who purported to be the medical director at each of the Hughes Clinics, and Gidwani and Fernandez, who prior to Hughes purported to be the medical directors at Healing Minds, did not, and could not have, legitimately systematically reviewed the Hughes Clinics' billings to ensure that they were neither fraudulent nor unlawful.

99.     Had Hughes, Gidwani, and Fernandez legitimately systematically reviewed the Hughes Clinics' billings to ensure that they were neither fraudulent nor unlawful, they would have noted – among other things – that each of the Hughes Clinics unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute, and they would have taken immediate corrective action.

**D.     The Defendants' Fraudulent Treatment and Billing Protocols**

100.    In the claims identified in Exhibits "1" - "3", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

21

101. Even so, in the claims identified in Exhibits "1" - "3", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the "treatment".

102. The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "3" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any significant continuing medical problems arising from any automobile accidents.

103. Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

104. No legitimate physician, health care practitioner, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

105. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.** **The Fraudulent Charges for Initial Examinations at the Hughes Clinics**

106. As an initial step in the Defendants' fraudulent treatment and billing protocol, almost all of the Insureds in the claims identified in Exhibits "1" - "3" purportedly received an initial examination at Centro de Rehab, Healing Minds, or B&A Physical.

107. Amador purported to personally perform most of the initial examinations in the

claims identified in Exhibits "1" - "3", at the direction of the Defendants.

108.    In the claims identified in Exhibit "1", the substantial majority of the initial examinations at Centro de Rehab were billed through Centro de Rehab to GEICO under CPT code 99204, typically resulting in a charge of $369.28 for each purported examination.

109.    In the claims identified in Exhibit "2", the substantial majority of the initial examinations at Healing Minds were billed through Healing Minds to GEICO under CPT code 99204, typically resulting in a charge of $369.28 for each purported examination.

110.    In the claims identified in Exhibit "3", the substantial majority of the initial examinations at B&A Physical were billed through B&A Physical to GEICO under CPT code 99204, typically resulting in a charge of $390.25 for each purported examination.

111.    In the claims for initial examinations identified in Exhibits "1" - "3", the charges for the initial examinations were fraudulent in that they misrepresented the Hughes Clinics' eligibility to collect PIP Benefits in the first instance.

112.    In fact, and as set forth herein, none of the Hughes Clinics was ever eligible to collect PIP Benefits, inasmuch as the clinics were operated in violation of Florida law.

113.    As set forth below, the charges for the initial examinations identified in Exhibits "1" - "3" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

114.    In the claims for initial examinations identified in Exhibits "1" - "3", the Defendants routinely misrepresented the severity of the Insureds' presenting problems.

115.    As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in

connection with the use of CPT codes.

116.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

117.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically requires that the Insured present with problems of moderate to high severity.

118.    The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

119.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

120.    By contrast, to the extent that the insureds in the claims identified in Exhibits "1" -

24

"3" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

121. For instance, in most of the claims identified in Exhibits "1" - "3", the Insureds did not seek treatment at any hospital as the result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibits "1" - "3" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue diagnosis.

122. Furthermore, in most of the claims identified in Exhibits "1" - "3", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

123. Even so, in the claims for initial examinations identified in Exhibits "1" - "3", the Defendants billed for the examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

124. For example:

(i) On August 31, 2022, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HC's vehicle did not deploy and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured in the accident, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of HC on September 1, 2022, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii) On January 20, 2023, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MJ's vehicle did not deploy and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured and did not complain of any pain at the scene. In keeping with the fact that MJ was not seriously injured in

25

the accident, MJ did not visit any hospital emergency room following the accident. To the extent that MJ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MJ on January 24, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)   On January 27, 2023, an Insured named KP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KP's vehicle did not deploy and that KP's vehicle was drivable following the accident. The police report further indicated that KP was not injured and did not complain of any pain at the scene. In keeping with the fact that KP was not seriously injured in the accident, KP did not visit any hospital emergency room following the accident. To the extent that KP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of KP on February 3, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)   On March 11, 2023, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CC on March 13, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)   On August 4, 2023, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KM's vehicle did not deploy and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured and did not complain of any pain at the scene. In keeping with the fact that KM was not seriously injured in the accident, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of KM on August 8, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)   On September 12, 2023, an Insured named RM was involved in an automobile

26

accident. The contemporaneous police report indicated that the airbags in RM's vehicle did not deploy and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured in the accident, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of RM on September 15, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On September 14, 2023, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KM's vehicle did not deploy and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured and did not complain of any pain at the scene. In keeping with the fact that KM was not seriously injured in the accident, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of KM on September 15, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On October 30, 2023, an Insured named OP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in OP's vehicle did not deploy and that OP's vehicle was drivable following the accident. The police report further indicated that OP was not injured and did not complain of any pain at the scene. In keeping with the fact that OP was not seriously injured in the accident, OP did not visit any hospital emergency room following the accident. To the extent that OP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of OP on October 30, 2023, Healing Minds, Garcia and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On November 14, 2023, an Insured named DH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DH's vehicle did not deploy and that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured and did not complain of any pain at the scene. In keeping with the fact that DH was not seriously injured in the accident, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported

initial examination of DH on November 20, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x) On December 27, 2023, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DM's vehicle did not deploy and that DM was not injured and did not complain of any pain at the scene. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of DM on December 27, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi) On March 22, 2024, an Insured named JT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JT's vehicle did not deploy and that JT was not injured and did not complain of any pain at the scene. In keeping with the fact that JT was not seriously injured in the accident, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JT on April 2, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii) On June 12, 2024, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MC on June 12, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii) On October 11, 2024, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AA's vehicle did not deploy and that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured in the accident, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident,

they were of minimal severity. Even so, following a purported initial examination of AA on October 14, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)    On October 11, 2024, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EA's vehicle did not deploy and that EA was not injured and did not complain of any pain at the scene. In keeping with the fact that EA was not seriously injured in the accident, EA did not visit any hospital emergency room following the accident. To the extent that EA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of EA on October 14, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)    On November 20, 2024, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RP's vehicle did not deploy and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain at the scene. In keeping with the fact that RP was not seriously injured in the accident, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of RP on November 21, 2024, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

125.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

126.      What is more, in the claims identified in Exhibits "1" - "3", the charges for the initial examinations under CPT code 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent providing the examinations.

127.      Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

128.      As set forth in Exhibits "1" - "3", the Defendants billed the purported initial examinations to GEICO through the respective Hughes Clinics under CPT code 99204, and thereby represented that the practitioners who purported to conduct the examinations spent at least 45 minutes performing the examinations.

129.      In fact, in the initial examinations identified in Exhibits "1" - "3", the practitioners who purported to perform the initial examinations on behalf of the Hughes Clinics – usually Amador – never spent more than 15-20 minutes when conducting the examinations, much less 45 minutes.

130.      In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "3" did not take more than 15-20 minutes of time to perform, the examining practitioners used template forms in purporting to conduct the examinations.

131.      All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

132.      These interviews and examinations did not require Amador or any other examining health care practitioner associated with the Hughes Clinics to spend more than 15-20 minutes

performing the putative initial examinations.

133. In the claims for initial examinations that are identified in Exhibits "1" - "3", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)     Misrepresentations Regarding the Extent of the Medical Decision-Making**

134. Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

135. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

136. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

137. For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem

with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

138. As set forth above and in Exhibits "1"- "3", most of the initial examinations that the Defendants billed through the respective Hughes Clinics to GEICO were billed under CPT code 99204, which represented that the examining health care practitioners engaged in some genuine, moderately-complex medical decision-making during the initial examinations.

139. In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

140. First, in the Defendants' claims for initial examinations identified in Exhibits "1" - "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

141. When the Insureds in the claims identified in Exhibits "1" - "3" presented to the respective Hughes Clinics for "treatment", they did not arrive with any significant medical records.

142. Furthermore, prior to the initial examinations, the Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

143. Second, in the Defendants' claims for initial examinations identified in Exhibits "1" - "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any complaints arising from their minor automobile accidents at all.

32

144. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants and their associates during the initial examinations.

145. In virtually all of the claims identified in Exhibits "1" - "3", any diagnostic procedures and treatment options that the Defendants and their associates recommended or provided during the initial examinations were limited to a series of medically unnecessary physical therapy and related services and goods – none of which was health- or life-threatening if properly administered.

146. Third, in the claims for initial examinations identified in Exhibits "1" - "3", the examining practitioners did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

147. Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, and prescribed a substantially similar course of medically unnecessary treatment for each Insured.

148. Specifically, in almost every instance in the claims identified in Exhibits "1" - "3", during the initial examinations, the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

149. Even so, the examining practitioners – at the direction of the Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every Insured.

150. Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the Defendants – falsely diagnosed virtually every Insured in the claims identified in

Exhibits "1" - "3" with a purported "emergency medical condition" in order to increase the amount

of PIP Benefits they could obtain, and then directed the Insureds to receive a series of medically

unnecessary physical therapy and related services and goods.

151.    Contrary to the Defendants' false diagnoses, the Insureds in the claims identified in

Exhibits "1" - "3" did not legitimately suffer from any "emergency medical conditions" – or any

significant health care problems at all – as the result of their typically minor automobile accidents.

152.    For example:

(i)     On July 22, 2022, an Insured named SJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SJ's vehicle did not deploy and that SJ's vehicle was drivable following the accident. The police report further indicated that SJ was not injured and did not complain of any pain at the scene. In keeping with the fact that SJ was not seriously injured in the accident, SJ did not visit any hospital emergency room following the accident. To the extent that SJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 25, 2022, Amador purported to conduct an initial examination of SJ at Centro de Rehab. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided SJ with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither SJ's presenting problems, nor the treatment plan provided to SJ by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, SJ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to SJ if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On July 25, 2022, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JA's vehicle did not deploy and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured in the accident, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 2, 2022, Amador purported to conduct an initial examination of JA at Centro de Rehab. Amador did not retrieve, review, or

34

analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided JA with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JA if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii) On November 20, 2022, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JG's vehicle did not deploy and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 28, 2022, Amador purported to conduct an initial examination of JG at Healing Minds. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided JG with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Amador and Healing Minds, presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Healing Minds consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JG if properly administered. Even so, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv) On January 9, 2023, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured and did not complain of any pain at the scene. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 9, 2023, Amador purported to conduct an initial examination of LM at Healing Minds. Amador did not retrieve,

review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided LM with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither LM's presenting problems, nor the treatment plan provided to LM by Amador and Healing Minds, presented any risk of significant complications, morbidity, or mortality. To the contrary, LM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Healing Minds consisted of medically unnecessary physical therapy treatment, which did not pose any risk to LM if properly administered. Even so, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On January 30, 2023, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JV's vehicle did not deploy and that JV was not injured and did not complain of any pain at the scene. In keeping with the fact that JV was not seriously injured in the accident, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 31, 2023, Amador purported to conduct an initial examination of JV at Centro de Rehab. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided JV with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JV's presenting problems, nor the treatment plan provided to JV by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, JV did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JV if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)     On February 18, 2023, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JC's vehicle did not deploy and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured in the accident, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 27, 2023, Amador purported to conduct an initial examination of JC at Healing Minds. Amador did not retrieve, review, or analyze any significant amount of medical records,

diagnostic tests, or other information in connection with the examination. Instead, Amador provided JC with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Amador and Healing Minds, presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Healing Minds consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JC if properly administered. Even so, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On March 27, 2023, an Insured named RA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RA's vehicle did not deploy and that RA's vehicle was drivable following the accident. The police report further indicated that RA was not injured and did not complain of any pain at the scene. In keeping with the fact that RA was not seriously injured in the accident, RA did not visit any hospital emergency room following the accident. To the extent that RA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 30, 2023, Amador purported to conduct an initial examination of RA at Centro de Rehab. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided RA with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither RA's presenting problems, nor the treatment plan provided to RA by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, RA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to RA if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On June 12, 2023, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KG's vehicle did not deploy and that KG was not injured and did not complain of any pain at the scene. In keeping with the fact that KG was not seriously injured in the accident, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 21, 2023, Amador purported to conduct an initial examination of KG at Healing Minds. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided KG

37

with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither KG's presenting problems, nor the treatment plan provided to KG by Amador and Healing Minds, presented any risk of significant complications, morbidity, or mortality. To the contrary, KG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Healing Minds consisted of medically unnecessary physical therapy treatment, which did not pose any risk to KG if properly administered. Even so, Healing Minds, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)    On August 20, 2023, an Insured named NT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NT's vehicle did not deploy and that NT's vehicle was drivable following the accident. The police report further indicated that NT was not injured and did not complain of any pain at the scene. In keeping with the fact that NT was not seriously injured in the accident, NT did not visit any hospital emergency room following the accident. To the extent that NT experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 21, 2023, Amador purported to conduct an initial examination of NT at Centro de Rehab. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided NT with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither NT's presenting problems, nor the treatment plan provided to NT by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, NT did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to NT if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)    On October 31, 2023, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SP's vehicle did not deploy and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not seriously injured in the accident, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 2, 2023, Amador purported to conduct an initial examination of SP at Centro de Rehab. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided SP with

38

substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither SP's presenting problems, nor the treatment plan provided to SP by Amador and Centro de Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and Centro de Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to SP if properly administered. Even so, Centro de Rehab, Garcia, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi)    On March 22, 2024, an Insured named JT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JT's vehicle did not deploy and that JT was not injured and did not complain of any pain at the scene. In keeping with the fact that JT was not seriously injured in the accident, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 2, 2024, Amador purported to conduct an initial examination of JT at B&A Physical. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided JT with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JT's presenting problems, nor the treatment plan provided to JT by Amador and B&A Physical, presented any risk of significant complications, morbidity, or mortality. To the contrary, JT did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and B&A Physical consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JT if properly administered. Even so, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)   On June 12, 2024, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 12, 2024, Amador purported to conduct an initial examination of MC at B&A Physical. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided MC with substantially the same list of false soft tissue injury "diagnoses" that she

provided virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Amador and B&A Physical, presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and B&A Physical consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MC if properly administered. Even so, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)   On August 22, 2024, an Insured named MM was involved in an automobile accident. Thereafter, on August 26, 2024, Amador purported to conduct an initial examination of MM at B&A Physical. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided MM with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Amador and B&A Physical, presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and B&A Physical consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MM if properly administered. Even so, B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)   On October 11, 2024, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AA's vehicle did not deploy and that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured in the accident, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 14, 2024, Amador purported to conduct an initial examination of AA at B&A Physical. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided AA with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by Amador and B&A Physical, presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and B&A Physical consisted of medically unnecessary physical therapy treatment, which did not pose any risk to AA if properly administered. Even so, B&A Physical, Rodriguez, and Hughes

40

billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)   On October 11, 2024, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EA's vehicle did not deploy and that EA was not injured and did not complain of any pain at the scene. In keeping with the fact that EA was not seriously injured in the accident, EA did not visit any hospital emergency room following the accident. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 14, 2024, Amador purported to conduct an initial examination of EA at B&A Physical. Amador did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Amador provided EA with substantially the same list of false soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither EA's presenting problems, nor the treatment plan provided to EA by Amador and B&A Physical, presented any risk of significant complications, morbidity, or mortality. To the contrary, EA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Amador and B&A Physical consisted of medically unnecessary physical therapy treatment, which did not pose any risk to EA if properly administered. B&A Physical, Rodriguez, and Hughes billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amador engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

153.   These are only representative examples. In the claims identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the purported examinations involved legitimate moderate complexity decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

154.   In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

155.   It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried

a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

156.   Even so, in the claims identified in Exhibits "1" - "3", the Defendants routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

157.   The Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever and had pre-determined outcomes.

158.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

159.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

160.   As set forth herein, in the claims identified in Exhibits "1" - "3", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

161.   It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "2" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

162.   It is even more improbable that this kind of pattern would recur with great frequency within the cohort of patients treating at individual health care clinics such as Centro de Rehab and Healing Minds, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms

warranting substantially similar diagnoses and treatment.

163. Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, the Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

164. For example:

(i) On July 14, 2021, two Insureds – LC and MJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, July 16, 2021. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided LC and MJ with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii) On November 14, 2021, two Insureds – RC and CG – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, November 15, 2021. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided RC and CG with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii) On July 27, 2022, two Insureds – JA and MR – were involved in the same automobile accident. Thereafter, both Insureds presented at Healing Minds for initial examinations by Amador on the exact same date, August 1, 2022. At the conclusion of the purported initial examinations, Amador – at the direction of Healing Minds, Garcia, Correa, Guerra, and Hughes – provided JA and MR with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv) On March 11, 2023, two Insureds – CA and PG – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, March 13, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided CA and PG with substantially similar false soft tissue injury "diagnoses", and recommended a substantially

similar course of medically unnecessary treatment to both of them.

(v)     On May 30, 2023, two Insureds – AG and FM – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, May 31, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided AG and FM with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)    On August 5, 2023, two Insureds – JO and JO – were involved in the same automobile accident. Thereafter, both Insureds presented at Healing Minds for initial examinations by Amador on the exact same date, August 7, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Healing Minds, Garcia, and Hughes – provided JO and JO with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii)   On August 10, 2023, two Insureds – MG and CV – were involved in the same automobile accident. Thereafter, both Insureds presented at Healing Minds for initial examinations by Amador on the exact same date, August 25, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Healing Minds, Garcia, and Hughes – provided MG and CV with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)  On September 14, 2023, two Insureds – AD and KM – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, September 15, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided AD and KM with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)    On October 31, 2023, three Insureds – SP, AS, and MS – were involved in the same automobile accident. Thereafter, all three Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, November 2, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of Centro de Rehab, Garcia, and Hughes – provided SP, AS and MS with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(x)     On December 15, 2023, two Insureds – RM and RN – were involved in the same automobile accident. Thereafter, both Insureds presented at Centro de Rehab for initial examinations by Amador on the exact same date, December 15, 2023. At the conclusion of the purported initial examinations, Amador – at the direction of

Centro de Rehab, Garcia, and Hughes – provided RM and RN with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

165.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" - "2", Amador – at the direction of Centro de Rehab, Garcia, Healing Minds, Guerra, Correa, and Hughes – frequently issued substantially similar "diagnoses" to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

166.    In the claims for initial examinations identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

167.    In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

168.    In the claims for initial examinations identified in Exhibits "1" - "3", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

45

(ii)      the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iv)      none of the Hughes Clinics was ever eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida Law.

**2.      The Fraudulent and Unlawful Charges for Follow-Up Examinations at the Hughes Clinics**

169.      In addition to their fraudulent initial examinations, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1" - "3" to multiple, fraudulent follow-up examinations during the course of their fraudulent and billing protocol.

170.      Amador purported to personally perform the substantial majority of the follow-up examinations in the claims identified in Exhibits "1" - "3".

171.      As set forth in Exhibits "1" - "3", the Defendants then billed the purported follow-up examinations through the respective Hughes Clinics to GEICO under: (i) CPT code 99211, typically resulting in a charge of $48.98 for each putative follow-up examination and (ii) CPT code 99214, typically resulting in a charge of between $225 and $250.26 for each putative follow-up examination.

172.      In the claims for follow-up examinations identified in Exhibits "1" - "3", the charges for the follow-up examinations were fraudulent in that they misrepresented the Hughes Clinics' eligibility to collect PIP Benefits in the first instance.

173.      In fact, and as set forth herein, none of the Hughes Clinics was ever eligible to collect PIP Benefits, inasmuch as the clinics were unlawfully operated in violation of Florida law.

174.      As set forth below, the Defendants' charges for the follow-up examinations identified in Exhibits "1" - "3" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**(i)      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

175.      Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

176.      The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)      Office evaluation of 38-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)      Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)      Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complaints of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)      Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)      Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)      Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

177.      Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient

examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

178.    However, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" suffered any injuries at all in their automobile accidents, the injuries were almost always minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

179.    Minor soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" - "3" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

180.    Even so, in the claims for the follow-up examinations under CPT code 99214 identified in Exhibits "1" - "3", the Defendants represented that the Insureds presented with problems of moderate to high severity.

181.    For example:

(i)    On July 25, 2022, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JA's vehicle did not deploy and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured in the accident, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of JA by Amador on August 22, 2022, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JA presented with problems of moderate to high severity during the examination.

(ii)    On November 20, 2022, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JG's

vehicle did not deploy and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of JG by Amador on December 13, 2022 and January 5, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that JG presented with problems of moderate to high severity during the examinations.

(iii)     On January 9, 2023, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured and did not complain of any pain at the scene. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of LM by Amador on February 14, 2023 and March 6, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that LM presented with problems of moderate to high severity during the examinations.

(iv)     On January 30, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MM's vehicle did not deploy and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured in the accident, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MM by Amador on February 22, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MM presented with problems of moderate to high severity during the examination.

(v)     On March 27, 2023, an Insured named RA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RA's vehicle did not deploy and that RA's vehicle was drivable following the accident. The police report further indicated that RA was not injured and did not complain of any pain at the scene. In keeping with the fact that RA was not seriously injured in the

accident, RA did not visit any hospital emergency room following the accident. To the extent that RA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of RA by Amador on August 3, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RA presented with problems of moderate to high severity during the examination.

(vi)   On June 12, 2023, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KG's vehicle did not deploy and that KG was not injured and did not complain of any pain at the scene. In keeping with the fact that KG was not seriously injured in the accident, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of KG on June 5, 2023 and August 3, 2023, Healing Minds, Garcia, and Hughes billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that KG presented with problems of moderate to high severity during the examinations.

(vii)   On July 17, 2023, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LF's vehicle did not deploy and that LF's vehicle was drivable following the accident. The police report further indicated that LF was not injured and did not complain of any pain at the scene. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of LF by Amador on August 22, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LF presented with problems of moderate to high severity during the examination.

(viii)   On August 4, 2023, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KM's vehicle did not deploy and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured and did not complain of any pain at the scene. In keeping with the fact that KM was not seriously injured in the accident, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of KM by Amador on August 30, 2023, Healing

50

Minds, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that KM presented with problems of moderate to high severity during the examination.

(ix)    On September 14, 2023, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KM's vehicle did not deploy and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured and did not complain of any pain at the scene. In keeping with the fact that KM was not seriously injured in the accident, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of KM by Amador on October 5, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that KM presented with problems of moderate to high severity during the examination.

(x)     On November 14, 2023, an Insured named DH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DH's vehicle did not deploy and that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured and did not complain of any pain at the scene. In keeping with the fact that DH was not seriously injured in the accident, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of DH by Amador on December 11, 2023, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DH presented with problems of moderate to high severity during the examination.

(xi)    On December 27, 2023, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DM's vehicle did not deploy and that DM was not injured and did not complain of any pain at the scene. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of DM by Amador on February 8, 2024, Healing Minds, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DM presented with problems of moderate to high severity during the examination.

(xii)   On March 22, 2024, an Insured named JT was involved in an automobile accident.

The contemporaneous police report indicated that the airbags in JT's vehicle did not deploy and that JT was not injured and did not complain of any pain at the scene. In keeping with the fact that JT was not seriously injured in the accident, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of JT by Amador on May 8, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JT presented with problems of moderate to high severity during the examination.

(xiii)   On June 12, 2024, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MC by Amador on July 24, 2024, B&A Physical, Rodriguez, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MC presented with problems of moderate to high severity during the examination.

(xiv)   On November 20, 2024, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RP's vehicle did not deploy and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain at the scene. In keeping with the fact that RP was not seriously injured in the accident, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of RP by Amador on January 6, 2025, Healing Minds, Garcia, and Hughes  billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RP presented with problems of moderate to high severity during the examination.

(xv)   On December 13, 2024, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EG's vehicle did not deploy and that EG was not injured and did not complain of any pain at the scene. In keeping with the fact that EG was not seriously injured in the accident, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as a result of the accident,

they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of EG by Amador on February 10, 2025, Centro de Rehab, Garcia, and Hughes billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that EG presented with problems of moderate to high severity during the examination.

182. These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for follow-up examination under CPT code 99214, and because follow-up examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

183. In the claims for follow-up examinations identified in Exhibits "1" - "3", the Defendants also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Results of the Follow-Up Examinations**

184. Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the examining practitioner engaged in medical decision making of "moderate complexity".

185. Though the Defendants often billed for the purported follow-up examinations using CPT code 99214, neither Amador, nor any other practitioner associated with the Hughes Clinics, engaged in any legitimate medical decision-making at all in connection with the examinations.

186. Rather, in the claims identified in Exhibits "1" - "3", following the purported follow-up examinations, the Defendants simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) caused the Insureds to be referred for

53

even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

187.   The putative "follow-up examinations" that the Defendants purported to provide the Insureds in the claims identified in Exhibits "1" - "3" were, therefore, medically useless and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the respective Hughes Clinics.

188.   In the claims for follow-up examinations identified in Exhibits "1" - "3", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   none of the Hughes Clinics was ever eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida law.

189.   In this context, Hughes, Fernandez, and Gidwani – who purported to serve as the "medical directors" of the respective Hughes Clinics – did not, and could not have, conducted systematic reviews of clinic billings to ensure that the billings were not fraudulent or unlawful.

190.   Had Hughes, Fernandez, and Gidwani actually fulfilled their statutory role as the medical directors at the respective Hughes Clinics, they would have noted – among other things –

that the Defendants routinely fraudulently represented in Hughes Clinics' billing that the putative follow-up examinations were legitimately and lawfully performed, and would have taken corrective action.

191.    Hughes, Fernandez, and Gidwani failed to do so, because they never actually served as legitimate medical directors at the Hughes Clinics in the first instance.

**c.      The Defendants' Charges for Illusory Follow-Up Examinations Under CPT Code 99211**

192.    As discussed herein, the Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" – "3" with a course of in-office physical therapy treatment.

193.    The Defendants then billed the physical therapy services to GEICO using a variety of CPT codes.

194.    At the same time, the Defendants routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211 contemporaneous with their supposed provision of physical therapy treatment, typically seeking between $40.00-$50.00 for each such putative follow-up examination.

195.    However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

196.    Instead, the Defendants billed GEICO for illusory follow-up examinations under CPT code 99211 in order to maximize the fraudulent billing they submitted to GEICO.

197.    In keeping with the fact that the follow-up examinations purportedly provided contemporaneously with the physical therapy services were illusory, the Defendants virtually never submitted any reports, notes, or any substantiating documentation in connection with the purported follow-up examinations billed under CPT code 99211.

198.    Even so, the Defendants routinely submitted charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

**3.      The Fraudulent Charges for PENS Treatments at the Hughes Clinics**

199.    Pursuant to the false, boilerplate diagnosis that they provided to virtually every Insured at the conclusion of their purported examinations, the Defendants purported to provide many Insureds with a large number of medically unnecessary PENS treatments.

200.    The Defendants then billed the PENS treatment to GEICO under CPT code 64999, typically resulting in charges of $650.00, per Insured, for each date of service on which they purported to provide the PENS treatment.

201.    Like all of the other Fraudulent Services that the Defendants purported to provide, the charges for the PENS treatments were fraudulent in that they falsely represented that the Defendants were entitled to payment in the first place, when in fact they were not because they operated in violation of Florida law.

202.    The charges for the PENS treatments also were fraudulent in that they were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined fraudulent protocols.

203.    In a legitimate clinical setting, PENS is a procedure that combines the features of electro-acupuncture and transcutaneous electrical nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PENS treatments are administered through fine needle-like electrodes that are placed in close proximity to the painful area and stimulate peripheral sensory nerves in the soft tissue.

56

204.   According to guidelines published by the Centers for Medicare and Medicaid Services, if pain is effectively controlled through PENS, then implantation of electrodes is warranted.

205.   CMS further instructs that physicians generally should be able to determine whether a patient is likely to derive a significant therapeutic benefit from continuing use of implanted electrodes within a one-month trial period.

206.   CMS also instructs that a patient can be taught how to utilize implanted electrodes and, once this is accomplished, can use them safely and effectively without physician supervision. As a result, it is inappropriate for a patient to visit their physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with PENS treatments.

207.   Even so, the Defendants routinely purported to provide large amounts of medically unnecessary PENS treatments to Insureds on an outpatient basis, in order to maximize the amount of fraudulent and unlawful billing they could submit to GEICO and other insurers.

208.   Moreover, to the extent that the Defendants actually provided any electrical stimulation treatments to Insureds in the first instance, the treatments consisted of ordinary electrical stimulation, not legitimate PENS treatments

209.   Electrical stimulation treatments are billable at a lower rate than PENS treatments.

210.   The Defendants deliberately misrepresented the electrical stimulation treatments they purported to provide to be PENS treatments in a calculated attempt to overcharge GEICO for the electrical stimulation treatments.

**4.      The Fraudulent Charges for Physical Therapy at the Hughes Clinics**

211.    In additional the fraudulent initial examinations, follow-up examinations, and PENS treatments, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1"-"3" to weeks of medically unnecessary physical therapy.

212.    Specifically, the Defendants caused virtually every Insured to receive at least three to four weeks of purported physical therapy treatments, typically several times per week.

213.    In addition, the Defendants caused virtually every Insured to receive substantially similar types of physical therapy services, including: (i) hot/cold packs; (ii) electrical stimulation; (iii) infrared therapy; (iv) ultrasound therapy; (v) manual therapy; and (vi) therapeutic activities.

214.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they received the physical therapy.

215.    By contrast, at the Hughes Clinics, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

216.    In addition, in the claims for physical therapy services identified in Exhibits "1"-"3", the Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Amador or Gomez-Cortes, when in fact they were unlawfully performed by massage therapists and unlicensed/unsupervised individuals associated with the Hughes Clinics, who are not and never have been licensed as physical therapists.

58

217.    In the claims for physical therapy services identified in Exhibits "1"-"3", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii)    the services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals;

(iii)   the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)    the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they unlawfully operated in violation of Florida law.

## III.    The Fraudulent Claims the Defendants Submitted to GEICO

218.    To support their fraudulent charges, the Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through Centro de Rehab, Healing Minds, and B&A Physical, respectively – containing thousands of individual charges – seeking payment for the Fraudulent Services that the Defendants were not entitled to receive.

219.    The claims that the Defendants submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary

and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

220.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

221.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

222.    For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

223.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

224.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

225.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

226.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,800,000.00.

227.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Centro de Rehab**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

228.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

229.    There is an actual case and controversy between GEICO and Centro de Rehab regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

230.    Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO because Centro de Rehab was unlawfully operated in violation of Florida law.

231.    Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO.

232.    Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

61

protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

233.    Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

234.    Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

235.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Centro de Rehab has no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Garcia**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

236.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

237.    Centro de Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

238.    Garcia knowingly conducted and/or participated in, directly or indirectly, the conduct of Centro de Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years seeking payments that Centro de Rehab was not eligible to receive under the No-Fault Law because: (i) Centro de Rehab was unlawfully operated in violation of Florida law; (ii) the

underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

239.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1".

240.    Centro de Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Garcia operated Centro de Rehab, inasmuch as Centro de Rehab was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Centro de Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Centro de Rehab continues to attempt collection on the fraudulent billing submitted through Centro de Rehab to the present day.

241.    Centro de Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Centro de Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault

billing.

242.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Centro de Rehab enterprise.

243.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION
### Against Garcia and Hughes
### (Violation of RICO, 18 U.S.C. § 1962(d))

244.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

245.    Centro de Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

246.    Garcia and Hughes were employed by – or associated with – the Centro de Rehab enterprise.

247.    Garcia and Hughes knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Centro de Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years seeking payments that Centro de Rehab was not eligible to receive under the No-Fault Law because: (i) Centro de Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and

were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

248. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

249. Garcia and Hughes knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

250. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Centro de Rehab enterprise.

251. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against Centro de Rehab, Garcia, and Hughes**
**(Under Fla. Stat. §§ 501.201 et seq.)**

252. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

65

253. Centro de Rehab, Garcia, and Hughes were actively engaged in trade and commerce in the State of Florida.

254. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

255. Centro de Rehab, Garcia, and Hughes engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

256. The bills and supporting documents submitted – or caused to be submitted – to GEICO by Centro de Rehab, Garcia, and Hughes were fraudulent in that they misrepresented: (i) Centro de Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

257. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Centro de Rehab, Garcia, and Hughes has been materially injurious to GEICO and its Insureds.

258. The conduct of Centro de Rehab, Garcia, and Hughes was the actual and proximate cause of the damages sustained by GEICO.

259. Centro de Rehab, Garcia, and Hughes's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,400,000.00.

260. By reason of Centro de Rehab, Garcia, and Hughes's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Centro de Rehab, Garcia, and Hughes**
**(Common Law Fraud)**

261.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

262.    Centro de Rehab, Garcia, and Hughes intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Centro de Rehab for the Fraudulent Services.

263.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Centro de Rehab was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

264.    Centro de Rehab, Garcia, and Hughes intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Centro de Rehab that were not reimbursable.

265.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the

fraudulent bills that were submitted – or caused to be submitted – by Garcia and Hughes through Centro de Rehab.

266. Centro de Rehab, Garcia, and Hughes's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

267. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTH CAUSE OF ACTION
### Against Centro de Rehab, Garcia, and Hughes
### (Unjust Enrichment)

268. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

269. As set forth above, Centro de Rehab, Garcia, and Hughes have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

270. When GEICO paid the bills and charges submitted – or caused to be submitted – by Centro de Rehab, Garcia, and Hughes through Centro de Rehab, it reasonably believed that it was legally obligated to make such payments based on Centro de Rehab, Garcia, and Hughes's improper, unlawful, and/or unjust acts.

271. Centro de Rehab, Garcia, and Hughes have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Centro de Rehab, Garcia, and Hughes voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

272. Centro de Rehab, Garcia, and Hughes's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

273. By reason of the above, Centro de Rehab, Garcia, and Hughes have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,400,000.00.

## SEVENTH CAUSE OF ACTION
### Against Healing Minds
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

274. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

275. There is an actual case and controversy between GEICO and Healing Minds regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

276. Healing Minds has no right to receive payment for any pending bills submitted to GEICO because Healing Minds was unlawfully operated in violation of Florida law.

277. Healing Minds has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO.

278. Healing Minds has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

279. Healing Minds has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

280. Healing Minds has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

281. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Healing Minds has no right to receive payment for any pending bills submitted to GEICO.

## EIGHTH CAUSE OF ACTION
### Against Garcia, Guerra, and Correa
### (Violation of RICO, 18 U.S.C. § 1962(c))

282. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

283. Healing Minds is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

284. Garcia, Guerra, and Correa have knowingly conducted and/or participated in, directly or indirectly, the conduct of Healing Minds' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit– thousands of fraudulent charges on a continuous basis for over three years seeking payments that Healing Minds was not eligible to receive under the No-Fault Law because: (i) Healing Minds was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent

70

Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

285.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2".

286.    Healing Minds' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Garcia, Guerra, and Correa operated Healing Minds, inasmuch as Healing Minds was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Healing Minds to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Healing Minds continues to attempt collection on the fraudulent billing submitted through Healing Minds to the present day.

287.    Healing Minds is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Healing Minds in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

288.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted through the Healing Minds enterprise.

289.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**NINTH CAUSE OF ACTION**
**Against Garcia, Guerra, Correa, and Hughes**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

290.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

291.     Healing Minds is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

292.     Garcia, Guerra, Correa, and Hughes were employed by – or associated with – the Healing Minds enterprise.

293.     Garcia, Guerra, Correa, and Hughes knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Healing Minds' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that Healing Minds was not eligible to receive under the No-Fault Law because: (i) Healing Minds was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

72

294. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

295. Garcia, Guerra, Correa, and Hughes knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

296. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted through the Healing Minds enterprise.

297. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TENTH CAUSE OF ACTION
### Against Healing Minds, Garcia, Guerra, Correa, and Hughes
### (Under Fla. Stat. §§ 501.201 et seq.)

298. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

299. Healing Minds, Garcia, Guerra, Correa, and Hughes were actively engaged in trade and commerce in the State of Florida.

300. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

301. Healing Minds, Garcia, Guerra, Correa, and Hughes engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

73

302.    The bills and supporting documents submitted to GEICO by Healing Minds, Garcia, Guerra, Correa, and Hughes were fraudulent in that they misrepresented: (i) Healing Minds' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

303.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Healing Minds, Garcia, Guerra, Correa, and Hughes has been materially injurious to GEICO and its Insureds.

304.    The conduct of Healing Minds, Garcia, Guerra, Correa, and Hughes was the actual and proximate cause of the damages sustained by GEICO.

305.    Healing Minds, Garcia, Guerra, Correa, and Hughes' unfair and deceptive acts have caused GEICO to sustain damages of at least $365,000.00.

306.    By reason of Healing Minds, Garcia, Guerra, Correa, and Hughes' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**ELEVENTH CAUSE OF ACTION**
**Against Healing Minds, Garcia, Guerra, Correa, and Hughes**
**(Common Law Fraud)**

307.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

308.    Healing Minds, Garcia, Guerra, Correa, and Hughes intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Healing Minds for the Fraudulent Services.

309.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Healing Minds was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

310.    Healing Minds, Garcia, Guerra, Correa, and Hughes intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Healing Minds that were not reimbursable.

311.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Healing Minds, Garcia, Guerra, Correa, and Hughes through Healing Minds.

312.    Healing Minds, Garcia, Guerra, Correa, and Hughes's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

313.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWELFTH CAUSE OF ACTION
### Against Healing Minds, Garcia, Guerra, Correa, and Hughes
### (Unjust Enrichment)

314. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

315. As set forth above, Healing Minds, Garcia, Guerra, Correa, and Hughes have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

316. When GEICO paid the bills and charges submitted – or caused to be submitted – by Healing Minds, Garcia, Guerra, Correa, and Hughes through Healing Minds, it reasonably believed that it was legally obligated to make such payments based on Healing Minds, Garcia, Guerra, Correa, and Hughes' improper, unlawful, and/or unjust acts.

317. Healing Minds, Garcia, Guerra, Correa, and Hughes have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Healing Minds, Garcia, Guerra, Correa, and Hughes voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

318. Healing Minds, Garcia, Guerra, Correa, and Hughes' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

319. By reason of the above, Healing Minds, Garcia, Guerra, Correa, and Hughes have been unjustly enriched in an amount to be determined at trial, but in no event less than $365,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against B&A Physical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

320. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

321. There is an actual case and controversy between GEICO and B&A Physical

regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

322. B&A Physical has no right to receive payment for any pending bills submitted to GEICO because B&A Physical was unlawfully operated in violation of Florida law.

323. B&A Physical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO.

324. B&A Physical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

325. B&A Physical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

326. B&A Physical has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

327. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that B&A Physical has no right to receive payment for any pending bills submitted to GEICO.

77

## FOURTEENTH CAUSE OF ACTION
### Against Roa and Rodriguez
### (Violation of RICO, 18 U.S.C. § 1962(c))

328.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

329.    B&A Physical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

330.    Roa and Rodriguez knowingly conducted and/or participated in, directly or indirectly, the conduct of B&A Physical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over 18 months seeking payments that B&A Physical was not eligible to receive under the No-Fault Law because: (i) B&A Physical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

331.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3".

78

332.    B&A Physical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Roa and Rodriguez operated B&A Physical, inasmuch as B&A Physical was not engaged in a legitimate health care practice and acts of mail fraud were, therefore, essential in order for B&A Physical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that B&A Physical continues to attempt collection on the fraudulent billing submitted through B&A Physical to the present day.

333.    B&A Physical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by B&A Physical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

334.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through B&A Physical.

335.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FIFTEENTH CAUSE OF ACTION**
**Against Roa, Rodriguez and Hughes**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

336.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

337.    B&A Physical is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

1961(4), that engages in activities that affect interstate commerce.

338. Roa, Rodriguez, and Hughes were employed by – or associated with – the B&A Physical enterprise.

339. Roa, Rodriguez, and Hughes knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of B&A Physical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over 18 months seeking payments that B&A Physical was not eligible to receive under the No-Fault Law because: (i) B&A Physical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

340. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

341. Roa, Rodriguez, and Hughes knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money)

80

by submitting or facilitating the submission of the fraudulent charges to GEICO.

342. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through the B&A Physical enterprise.

343. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTEENTH CAUSE OF ACTION
### Against B&A Physical, Roa, Rodriguez, and Hughes
### (Under Fla. Stat. §§ 501.201 et seq.)

344. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

345. B&A Physical, Roa, Rodriguez, and Hughes were actively engaged in trade and commerce in the State of Florida.

346. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

347. B&A Physical, Roa, Rodriguez, and Hughes engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

348. The bills and supporting documents submitted to GEICO by B&A Physical, Roa, Rodriguez, and Hughes were fraudulent in that they misrepresented: (i) B&A Physical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

349. Such acts and practices offend public policy and are immoral, unethical, oppressive,

81

and unscrupulous. Additionally, the conduct of B&A Physical, Roa, Rodriguez, and Hughes has been materially injurious to GEICO and its Insureds.

350. The conduct of B&A Physical, Roa, Rodriguez, and Hughes was the actual and proximate cause of the damages sustained by GEICO.

351. B&A Physical, Roa, Rodriguez, and Hughes's unfair and deceptive acts have caused GEICO to sustain damages of at least $50,000.00.

352. By reason of B&A Physical, Roa, Rodriguez, and Hughes's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## SEVENTEENTH CAUSE OF ACTION
### Against B&A Physical, Roa, Rodriguez, and Hughes
### (Common Law Fraud)

353. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

354. B&A Physical, Roa, Rodriguez, and Hughes intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through B&A Physical for the Fraudulent Services.

355. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that B&A Physical was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary;

and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

356. B&A Physical, Roa, Rodriguez, and Hughes intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through B&A Physical that were not reimbursable.

357. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by B&A Physical, Roa, Rodriguez, and Hughes through B&A Physical.

358. B&A Physical, Roa, Rodriguez, and Hughes's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

359. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTEENTH CAUSE OF ACTION**
**Against B&A Physical, Roa, Rodriguez, and Hughes**
**(Unjust Enrichment)**

360. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-227, above.

361. As set forth above, B&A Physical, Roa, Rodriguez, and Hughes have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

362. When GEICO paid the bills and charges submitted – or caused to be submitted –

by B&A Physical, Roa, Rodriguez, and Hughes through Infinity Medical, it reasonably believed that it was legally obligated to make such payments based on B&A Physical, Roa, Rodriguez, and Hughes' improper, unlawful, and/or unjust acts.

363.    B&A Physical, Roa, Rodriguez, and Hughes have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that B&A Physical, Roa, Rodriguez, and Hughes voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

364.    B&A Physical, Roa, Rodriguez, and Hughes' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

365.    By reason of the above, B&A Physical, Roa, Rodriguez, and Hughes have been unjustly enriched in an amount to be determined at trial, but in no event less than $50,000.00.

## JURY DEMAND

366.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgement be entered in their favor:

A.    On the First Cause of Action against Centro de Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Centro de Rehab has no right to receive payment for any of the pending bills submitted to GEICO.

B.    On the Second Cause of Action against Garcia, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C.    On the Third Cause of Action against Garcia and Hughes, compensatory damages

in favor of GEICO in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

D.     On the Fourth Cause of Action against Centro de Rehab, Garcia, and Hughes, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.     On the Fifth Cause of Action against Centro de Rehab, Garcia, and Hughes, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.     On the Sixth Cause of Action against Centro de Rehab, Garcia, and Hughes, more than $1,400,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.     On the Seventh Cause of Action against Healing Minds, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Healing Minds has no right to receive payment for any of the pending bills submitted to GEICO.

H.     On the Eighth Cause of Action against Garcia, Guerra, Correa, and Hughes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $365,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I.     On the Ninth Cause of Action against Garcia, Guerra, Correa, and Hughes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $365,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18

85

U.S.C. § 1964(d), plus interest.

J.        On the Tenth Cause of Action against Healing Minds, Garcia, Guerra, Correa, and Hughes, compensatory damages in an amount to be determined at trial but in excess of $365,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

K.        On the Eleventh Cause of Action against Healing Minds, Garcia, Guerra, Correa, and Hughes, compensatory damages in an amount to be determined at trial but in excess of $365,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.        On the Twelfth Cause of Action against Healing Minds, Garcia, Guerra, Correa, and Hughes, more than $365,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.        On the Thirteenth Cause of Action against B&A Physical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that B&A Physical has no right to receive payment for any of the pending bills submitted to GEICO.

N.        On the Fourteenth Cause of Action against Roa and Rodriguez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

O.        On the Fifteenth Cause of Action against Roa, Rodriguez, and Hughes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

P.        On the Sixteenth Cause of Action against B&A Physical, Roa, Rodriguez, and

86

Hughes, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Q.      On the Seventeenth Cause of Action against B&A Physical, Roa, Rodriguez, and Hughes, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

R.      On the Eighteenth Cause of Action against B&A Physical, Roa, Rodriguez, and Hughes, more than $50,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
       November 25, 2025

*/s/ Max Gershenoff*
_____
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)

**RIVKIN RADLER LLP**
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225

-and-

926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3226
Facsimile: (516) 357-3333
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
*Counsel for Plaintiffs*